# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

LAVERN GILL,                    )
                                )
Plaintiff,                      )
                                )
vs.                             )        NO. 3:11-CV-457
                                )
COUNTY OF LAPORTE,              )
                                )
Defendant.                      )

## OPINION AND ORDER

This matter is before the Court on: (1) Defendant's Motion for Summary Judgment, filed on March 27, 2013; and (2) Defendant's Motion to Admit Evidence, filed on June 17, 2013. For the reasons set forth below, these motions are **GRANTED**. Because no claims remain pending, this case is **DISMISSED** and the Clerk is **ORDERED** to enter judgment in favor of Defendant and close this case.


BACKGROUND

On November 29, 2011, Plaintiff, Lavern Gill, filed suit against her former employer, Defendant, LaPorte County, arising from her being terminated from her employment as a LaPorte County emergency dispatcher. In her six-count complaint, Gill alleged that LaPorte County officials: discriminated against her on the basis of race in violation of Title VII of the Civil Rights Act

(Count 1) and 42 U.S.C. section 1981 (Count 2); discriminated against her on the basis of her sex, in violation of Title VII (Count 3); created a hostile work environment, in violation of Title VII (Count 4); retaliated against her for engaging in protected conduct, in violation of Title VII (Count 5) and section 1981 (Count 6). Gill has since elected not to pursue the sex discrimination, hostile work environment or retaliation claims, leaving only the race discrimination claims pending for disposition. (DE# 25, n.1).

LaPorte filed the instant motion for summary judgment on the remaining two counts of racial discrimination, arguing that there were no material facts in dispute and that it was entitled to judgment as a matter of law. During the summary judgment briefing, Gill questioned the admissibility of certain evidence that Lapore relied upon. This prompted LaPorte to file a motion to admit that challenged evidence.


## DISCUSSION

## Motion to Admit Evidence

Contained within Gill's response to LaPorte's summary judgment is a section entitled "Statement of Material Facts in Dispute." (DE# 25, p. 1). In that section, Gill briefly asserts four of the facts asserted by LaPorte are irrelevant and should be stricken. In response, LaPorte has filed this motion to admit, explaining the

relevance of the four facts Gill challenges.

To start, Gill's disputes are woefully short and lack any substantive argument. Instead, they consist of little more than a basic cite to either Rule 102 or 103 of the Federal Rules of Evidence and a conclusion that the factual statement is inadmissable based on the applicable rule. This is insufficient to carry the day. If Gill believes any of LaPorte's factual statements should be stricken, then Gill should file a separate motion to strike (L.R. 7.1(b)), and should provide adequate argument and legal citation to support such a belief.

Despite Gill's deficient complaints, LaPorte nonetheless filed this motion to admit the evidence Gill complained of. Unfortunately, Gill failed to respond to this motion to admit; yet, another example of failing to carry the day.

LaPorte's motion to admit explains the relevancy of the disputed factual statements, and Gill has failed to provide any response. As such, this Court will admit those factual statements for the purpose of summary judgment.

LaPorte's motion also takes issue with a statement contained in Gill's statement of additional material facts. Gill provided that:

> 9. "At the time of the transfer, Gill became aware of a comment, made by Denise West, a Caucasian LaPorte County supervisor at the Center, that the 9-1-1 Center 'would have to get separate headsets [for the dispatchers] because [the Caucasian employees didn't want

the [African Americans', i.e. Gill's] hair grease on the headphones." (Gill Dep., p. 112, 1. 6-18; p. 114, 1-12).

LaPorte sets out that, because this statement was made by Denise West and is relied upon for the truth of the matter asserted, it is inadmissable hearsay under Rule 802 of the Federal Rules of Civil Procedure. That is true and, as such, cannot be admitted to support her opposition to summary judgment. *Luster v. Illinois Dept. Of Corrections*, 652 F.3d 726, 731 n. 2(7th Cir. 2011)(explaining that hearsay cannot defeat a motion for summary judgment).

Motion for Summary Judgment

Summary judgment standard

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court

must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also*

*Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993).
Therefore, if a party fails to establish the existence of an
essential element on which the party bears the burden of proof at
trial, summary judgment will be appropriate.

Facts

In 2008, LaPorte County and the City of LaPorte merged their
emergency dispatch call center with the Michigan City Police
Department's dispatch unit, which resulted in the formation of the
LaPorte County E-9-1-1 Regional Dispatch Center ("911 Center").
The Michigan City dispatchers were offered employment under a
transfer agreement to the newly combined 911 Center. (Ex. 1, aff.
W. Perkins; Ex. 2, Deposition of L. Gill, 8/29/12, pp. 52, 53; Ex.
3, Dispatcher Transfer Agreement). Eight of the nine Michigan City
Police Department dispatchers, including Gill, accepted the offer
of transfer. (Ex. 1, aff. W. Perkins; Ex. 2, Gill dep, pp. 53, 57;
Ex. 3). Gill was one of two African Americans employed in the
Michigan City Police Dispatch Center at the time of consolidation
and the only African American that elected to transfer to LaPorte
County. (Gill dep., p. 112).

Gill began work at the 911 Center on April 14, 2008, with
salary and benefits at the same level she had been receiving as a
Michigan City Police Department dispatcher. (Ex. 2, Gill dep. pp.
64,65,83, 84). After the merger, the 911 Center had a Director,

Brent Soller, an Assistant Director, Beth West, and 27 full-time and 4 part-time employees. (Ex. 2, Gill dep. pp. 64-65,83-84).

The duties of a dispatcher at the 911 Center were designated in the position description for the job. A dispatcher had the responsibility to receive and evaluate emergency and non-emergency calls for service, to maintain radio contact with law enforcement services and to dispatch the appropriate public safety units. (Ex. 2, Gill dep. p. 64-65, 83-84). Prior to her transfer, Gill received a copy of the job description for the dispatcher position and was familiar with these duties. (Ex. 4, Position Description; Ex. 2, Gill dep, p. 57; deposition exhibit 4). The 911 Center operated under work rules contained in its Policy and Procedures Manual. (Ex. 1, aff. W. Perkins; Ex. 5 LaPorte County E-9-1-1 Communications Center Policy and Procedure Manual; which Gill received on February 21, 2008. Ex. 6, LaPorte County 9-1-1 SOP Issued Receipt signed by L. Gill, 2/21/2008). Dereliction of duty and neglect of duty were both identified as cause for discipline including dismissal. (Ex. 5, pp. 20-21).

The 911 Center consists of a large room outfitted with phone and computer communications equipment designed for receiving and dispatching call information. (Ex. 1, aff W. Perkins). The procedure for dispatching calls is that during each shift a designated person known as the call taker or comp taker answers all incoming telephone calls for service and inputs the information

from the caller, including the geographical area, into the computer program which forwards it to the terminal at the console corresponding to the designated geographical area of the call, i.e., Michigan City, LaPorte City or LaPorte County. *(Id.*). The dispatcher working at the console that receives the call for service reviews the geographical information and selects the appropriate district/grid or area that corresponds to the address and immediately dispatches the information to the officer working in that district/grid or area nearest to the address. (*Id.*). Michigan City has six areas designated by the 911 Center with one officer assigned to each area so that on any one shift there would be 6 officers to receive calls for service. *(Id.*). For calls dealing with Michigan City, the dispatcher could radio the officer by calling his or her squad car number or could use the MDT system which is a form of instant messaging with the officer's computer. (*Id.*). Once a call is entered into the dispatcher's computer, the normal procedure called for the dispatcher to run a warrants check on a subject through the IDACS/NCIC identification system. (Gill dep., p. 66).

The officer or responding agency makes the decision to proceed with the call or cancel the call. (Id.). Cancelling the call does not delete the information taken but it ends all response to the call. (Id.). The necessity of dispatching all calls for police assistance to the appropriate law enforcement officer and to allow

the officer or police agency to decide what course of action to take was made clear to LaPorte following a case involving Tonya Goble Studer and her mother in 2006. Studer had called the LaPorte County 911 Regional Dispatch Center asking that an officer be sent to her home because she feared that her estranged husband might come to the house and hurt her and her children. The dispatcher decided that because Studer's husband was not at the house at the time of the call there was no immediate threat and she did not dispatch the officers just to have them wait for him and she advised Studer to call back if her husband returned. (Ex. 1, aff. W. Perkins). Within an hour of the call, the husband returned and shot and killed both Tonya and her mother. (Ex. 1, aff. W. Perkins, with attached news article). After this event, the policy and training procedure for dispatchers was that all calls requesting the assistance of police, fire or emergency responders would be dispatched to the location given and that the officer or agency receiving the dispatch would decide on the response. (Ex. 1, aff. W. Perkins, Ex. 7, Memorandum, 9-1-1 telephone calls).

In 2008, this Memorandum, along with any additional changes to the department's policies, was kept on a "memo board." (Ex. 1, aff. W. Perkins). The "memo board" is a clip board containing all written memos and directives implemented by the 911 Center and is located in the front of the Center on a table. (*Id.*). Gill, along with the other 7 Michigan City dispatchers, was told to read all

the memos and written directives kept on the memo board. *(Id.)*. In fact, all employees are evaluated on their knowledge and ability to stay current on the changes with department policies and "reads memos on board." *(Id.)*.

Gill was evaluated and given a rating of three on her ability to stay current on changes and knowledge of the memo on the board. (Ex. 8, L. Gill Evaluation, 4/29/2009). Wendy Perkins was Gill's supervisor at the time and commented on her evaluation to "make sure [she] keep [herself] familiar with all of the department policies." *(Id.)*. Gill acknowledged this evaluation with her signature on May 1, 2009. (Id.).

On October 13, 2010, a Michigan City resident called the 911 Center and spoke to Danielle Zukowski, the then shift supervisor and designated call taker during that shift. (Ex. 9, aff, D. Zukowski). The caller gave his name and address, and stated that his house was previously broken into and that Michigan City Police Detective Baker was investigating. He stated that the person suspected of the burglary had warrants for her arrest and he invited her to his house so that the police could catch her. (Ex. 9, aff. D. Zukowski; Ex. 10, screen page, Call for Service, 10/13/2010). Zukowski entered the information on this call and it was sent to the Michigan City console where Gill was working. (Ex. 9, aff. D. Zukowski). Gill, however, reviewed the information but did not dispatch the call to the officer assigned to this area.

(Ex. 2, Gill dep, pp. 66, 67, 238). Gill followed the normal procedure of checking for any outstanding warrants on the suspect through the IDACS/NCIC system and also physically checked the warrant cabinet and confirmed that there was no physical warrant. (Gill dep. p. 66). She found no outstanding warrants and cancelled the call. (Ex. 2, Gill dep., pp. 66, 67, 238). Gill informed Zukowski that the person was not wanted and that she was going to cancel the call. *(Id.* at p. 230). Zukowski suggested that she call the detective. *(Id.* at pp. 230, 231). The caller eventually called back and asked Zukowski why an officer was not dispatched to his home. *(Id.).* Gill told Zukowski that she telephoned Detective Baker and left him a message but did not speak with the detective or receive any direction from an officer on how to handle the call. (Ex. 2, Gill dep, p. 233-36; Ex. 9, aff. D. Zukowski).

Also on October 13, 2010, a call was received asking for officers to come to an apartment in the City of LaPorte where the caller said a subject was wanted by police. Zukowski entered the subject's name and the address of the apartment into the computer and it was transferred to the LaPorte City console. (Ex. 9, aff. D. Zukowski). Ang Brown, a white female, was the dispatcher working at the LaPorte City console and she reviewed the call but did not dispatch it. Instead, she checked for any outstanding warrants on the subject and when she found none she cancelled the call without talking to an officer to get further direction on how to handle the

call. (Ex. 9, aff. D. Zukowski). The caller called a second time and asked Zukowski why no officers arrived.   (Id.). Zukowski entered the call again and this time officers were dispatched and they located a warrant and arrested the subject. (Ex. 9, aff. D. Zukowski).

Zukowski reported these two incidents to Director Soller who, on October 15, 2010, terminated Gill and Brown for dereliction of duty for not dispatching their respective calls. (Ex. 9, aff. D. Zukowski; Ex.11, Disciplinary Action Memorandum, L. Gill, 10/15/10; Ex. 12, Disciplinary Action Memorandum, A. Brown, 10/15/10). Zukowski, LaPorte County Commissioner Barbara Huston, and LaPorte County Human Resource Director, Joyce Leon, approved of the two discharges. (Ex. 11 and 12, Disciplinary Action Memoranda).

On October 16, 2010, a security alarm company reported to the 911 Center that a motion activated home burglary alarm had signaled at a residence in Michigan City. (Ex. 13, affidavit of John Dudek; Ex. 14, Call for Service Report, 10/16/10). Colleen Mair, a white female, was the call taker who entered the alarm into the computer system. John Dudek was the dispatcher at the Michigan City console at the time and he dispatched the Michigan City police in the area to the home. (*Id.*). The officers reported that the home was secure and advised it was a false alarm. *Id.* About a half hour later, the alarm activated again but this time the call went to Kim Ritter, a white female. Ritter did not enter the alarm call in order to

dispatch officer to the call because she assumed the house was secure from the officers' previous visit. After the burglary, the homeowner complained to the Michigan City Police Department and wanted to know why the officers did not respond to the second alarm because someone with a stolen house key had hid in the house until the officers left the scene after the first alarm. (Ex. 15, e-mail from Sgt. Zolvinski, Michigan City Police Department to Chief Tim Richardson, 10/17/10). Michigan City Police Chief Tim Richardson reported the incident to Soller. *(Id*, e-mail from T. Richardson to B. Soller, 10/21/10). Ritter was terminated on October 22, 2010, by Soller and her immediate supervisor, Denise West, for dereliction of duty for failing to enter the second alarm call in order for the call to be dispatched to the appropriate law enforcement agency. (Ex. 16, Disciplinary Action Memorandum, K. Ritter, 10/22/10).

Service training and continuing education for all dispatchers is provided and paid for by LaPorte County. (Ex. 1, aff. W. Perkins). Then Assistant Director Beth West scheduled training for new employees including the 8 dispatchers who transferred from the Michigan City Police Department. *(Id.).* Gill and the Michigan City dispatchers were crossed trained by the La Porte County dispatchers at the same time the La Porte County dispatchers were crossed trained on the Michigan City Police Department Console and Radio system. *(Id.).*

Gill received training on taking calls from rural Hudson

Township and St. Joseph County Fire Dispatch, use of 911 Center computers and programs download and installation, procedures used by LaPorte County Sheriff Jail Division when operating the secured IDAC's terminal. (Ex. 17, Training Records-Guidelines).

Gill was also given training on radio and dispatch functions at every console. (Ex. 18-1, The Radio, 11/20/08; Ex. 18-2, La Porte City Police Dispatch Concepts, 11/20/08; Ex. 18-3, LaPorte County Police Dispatch Concepts, 11/20/08; Ex. 18-4, Michigan City Police Department Dispatch Concepts, 2/7/09; Ex. 18-5 Use and Basic Concepts of IDAC/NCIC, 11/20/08; Ex. 18-6, Use of CAD System, 11/20/2008). In addition to training sessions Gill was sent at County expense to the Emergency Medical Dispatch (EMD) training class in Crown Point along with a male dispatcher, Scott Covington from August 25 to 27, 2008. (Ex. 19, Memorandum, B. West to S. Covington and L. Gill, 8/20/08). Gill passed the EMD Certification test and was certified by the National Academy of Emergency Dispatch (NAED) on September 17, 2008. (Ex. 20, NAED certification notice to L. Gill, 9/17/08). Gill was recertified by NAED on 9/2/10. (Ex. 21, NAED recertification notice to L. Gill, 9/2/10).

Gill did not receive any write ups or loss of pay for not taking training courses. (Ex. 2, Gill dep, p. 137). Other employees received training based upon their schedules. Torri Cazy, a white female, never made a request to be transferred to a different shift. (Ex.1, aff. W. Perkins; Ex.22, aff. Torri Cazy).

The request for Cazy's transfer came from Wendy Perkins, who at the time was her supervisor. *(Id.).* Perkins orally informed Brent Soller and Beth West that Cazy was not getting the adequate training she needed on Perkins' shift. *(Id.).* Torri Cazy was the newest dispatcher hired on March 22, 2008 and did not have any prior dispatching experience. *(Id.).* Perkins felt that Cazy needed to be moved to a different shift to receive the training she needed to perform the duties of a dispatcher. *(Id.).* Cazy was not subjected to a hostile work environment. (Ex.22, aff. T. Cazy).

When Gill first started working at the 911 Center she got along with everyone on her shift. (Ex. 2, Gill dep, p. 86). However, there came a time when she thought two co-employees, Carrie Patton and Wendy Perkins, her supervisor, were constantly picking at her and that they reported every little thing she did to get her written up. Gill asked that Director Soller transfer her to another shift. (I*d., pp. 74-75).*

Gill used obscene language and swearwords in her conversations with other employees at work. (Ex. 2, Gill dep, p. 75, 82). On one occasion, when she was talking about Michigan City Chief of Police Kintzele, Gill told a group of co-employees and officers that: "If I ever see him, I'm going to punch him in his fucking face." (*Id.* at pp. 76-77, 81). Gill thought this was a fun conversation and that everyone took it as a joke, similar to when she would say to police officers who stopped by the 911 Center: "I'm gonna kick your

ass." (*Id.* at p. 83). Carrie Patton e-mailed Soller about Gill's statement about Chief Kintzele. (*Id.* at p. 77; Ex. 23, e-mail from C. Patton to B. Soller, 11/21/08). Five days later, Gill wrote Soller that she was unhappy with Patton and Perkins because of their constant negativity, whispering and talking about people and that Patton was taking her comments about Chief Kintzele out of context and just trying to get her written up. (Ex. 2, Gill dep, p. 75; Ex. 24, letter from L. Gill to B. Soller, 11/25/08).

Director Soller reassigned Gill from the Michigan City console to another station and Gill met with him to ask what was going on and why was she being reassigned. (Ex. 2, Gill dep, at p. 90). Soller told Gill that a complaint had been made about the Kintzele comment and that he was investigating it and as soon as he received the report from Officer Justin Frever who heard the statement he would let her know of his decision. (Ex. 2, Gill dep, pp. 89-91, 93; Ex 25, Michigan City Police Department Supplemental Report J. Frever). Gill was not disciplined for her comments and was later re-assigned to her Michigan City console. (*Id.* at p. 94).

After Gill complained to Director Soller about Patton and Perkins, Soller promised that he would do something about it and on December 4, 2008, he told Gill that he advised them that they had 30 days to correct their conduct. (Ex. 2, Gill dep, p. 100). Soller also told Gill that she would not have a problem with Perkins because she will recognize the consequences of her conduct

but he felt that she would still have a problem with Patton. (Id.).

Soller issued a disciplinary warning to Patton stating that he had received several complaints regarding her negative attitude and whispering about other shift members behind their backs which made it very uncomfortable to work. (Ex. 26, Disciplinary Action Memo to C. Patton, 12/4/08). In his warning to Perkins, who supervised the shift, Soller wrote that several complaints had been made about her whispering with some shift members and how that made it uncomfortable for other shift members. (Ex. 27, Disciplinary Action Memorandum, W. Perkins, 12/4/08). He also was concerned that she had commented that she was tired of training or refusing to train her shift properly and that she was not training the Michigan City transfers on the common procedures in using the new police radios. (Id.). Soller advised both Patton and Perkins that they had 30 days to correct the issues he presented and that he would be talking again to the people who complained to see if there was any improvement. (Ex. 26 and Ex. 27). There were no further incidents or disciplinary action involving Perkins and Gill. (Ex. 1, aff. W. Perkins).

On March 11, 2009, Patton used obscene language when she referred to Gill at the beginning of her midnight shift. (Ex. 26, Disciplinary Action Memorandum, C. Patton, 3/17/09). Gill was not present at the time of Patton's comments but another dispatcher, Pam Rensberger, sent an e-mail to Soller stating that she overheard

Patton refer to Gill as a fucking bitch whom she would make certain was going to do work that shift. (Ex. 28, Rensberger e-mail to B. Soller, 3/17/09). Rensberger confided with and was friendly towards Gill. (Ex. 2, Gill dep, p. 193). In her e-mail, Rensberger stated that she had never worked with such hostile or angry people until Patton came to the shift. (Id.). On March 18, 2009, Patton was terminated by Soller, LaPorte County Commissioner Barbara Huston, and the County Human Resource Director, Joyce Leon, for using inappropriate and offensive language and creating an uncomfortable and hostile working environment. (Ex. 29, Disciplinary Action Memorandum, C. Patton, 3/17/09).

On October 4, 2010, Rensberger made a comment at work about her son coming to the house dirty and referred to him as being "niggerish." (Ex. 2, Gill dep, p. 193). Gill did not hear the comment but another employee, Torri Cazy, told her what Rensberger had said. (Id. at p. 193, 199). Gill told Cazy that she should contact the County's human resources department and let them know about the comment. (Id. at p. 197). Joyce Leon, the Director of Human Resources for the County received the complaint and investigated and issued a memorandum of her findings. She found that Rensberger violated the County's Equal Employment Opportunity/Anti-Harassment Policy by repeating the comment which was offensive and unacceptable. (Ex. 30, Memorandum of J. Leon to B. Soller, 10/5/10). Leon wrote in her memo to Soller that she

expected Rensberger to receive a write-up for her comment and a warning that any further occurrence of this nature or retaliation taken by her would result in termination. *(Id.)*. She also noted that although the employee who reported the incident thought Soller was in the vicinity of the comment by Rensberger, Soller told her that he could not recall the incident. *(Id.)*. On October 18, 2010, Rensberger was given a disciplinary warning regarding this incident by Soller, which was approved by LaPorte County Commissioner Barb Huston, and Leon. (Ex. 31, Disciplinary Action Memorandum, 1/18/10).

On September 10, 2010, Zukowski emailed LaPorte County Commissioner Barbara Huston that she was having problems with Gill creating a hostile working environment for her by talking about her daughter's civil court case. (Ex. 32, email from D. Zukowski to B. Huston). Gill was asked about the incident and denied saying anything. (Id.).

<u>Title VII of the Civil Rights Act and 42 U.S.C. § 1981.</u>

Gill alleges that she was discriminated against on the basis of her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5, and in violation of his equal rights under the law, 42 U.S.C. § 1981. Because Title VII and 1981 claims are analyzed in the same manner, these claims will be addressed simultaneously. *Patton v. Indianapolis Pub. Sch. Bd.,*

276 F.3d 334, 337-38 (7th Cir. 2002). There are two ways a race discrimination claim can be proven. There is a direct and an indirect method. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938 (7th Cir. 2003). Gill attempts to demonstrate a triable issue of fact by proceeding under both methods.

<u>The direct method</u>

Under the direct method a plaintiff must "show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose." *Id*. at 938-939. Direct evidence consists of either an outright admission by the decision maker that the challenged action was undertaken because of the [plaintiff's race] or a convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action. *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012)(citations and quotations omitted). Gill does not cite to any admissions of discrimination, and relies, instead, on circumstantial evidence form which she alleges a trier of fact could reasonably infer that LaPorte discriminated against her because of her race.

To create a convincing mosaic, a plaintiff can rely on "three different types of circumstantial evidence of intentional discrimination: (1) suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees

in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the plaintiff was qualified for the job in question but was passed over in favor of a person outside the protected class and that the employer's stated reason was a pretext for discrimination." *Id.* (citations and footnotes omitted). Ultimately, the circumstantial evidence a plaintiff presents "must point directly to a discriminatory reason for the employer's action" and be "directly related to the employment decision." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); *Venturelli v. ARC Cmty. Services, Inc.,* 350 F.3d 592, 602 (7th Cir. 2003). Here, Gill claims to have direct evidence regarding all three categories.

> There is insufficient evidence of suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference <u>of discriminatory intent might be drawn.</u>

Gill points to the suspicious timing of Danielle Zukowski's September 10, 2010, complaint to Commissioner Barbara Huston that Gill was creating a "hostile work environment," when Gill was discussing Zukowski's daughter's court case at work. Zukowski's complaint to Huston was made thirty-three (33) days before Zukowski sent Beth West an e-mail explaining how Gill took the call that

ultimately led to her termination. (Ex. 32). This temporal proximity between Zukowski's complaint to Huston and Zukowski's e-mail that utlimately led to Gill's termination, Gill argues, could allow a reasonable jury to infer that Zukowski's e-mail to Beth West was pretextual. It is true that Danielle Zukowski complained to Huston about Gill approximately a month before Zukowski informed West of Gill's failure to follow dispatch policy. However, timing alone is not enough to prove racial discrimination. Lewis v. Chicago, 496 F.3d 645, 656 (7th Cir. 2007).

There is nothing to suggest that Zukowski's September 10, 2010, complaint was racially motivated. It only shows that Zukowski was upset with Gill for discussing Zukowski's daughter at work. In the same vein, there is nothing in the record to show that Zukowski's September 10, 2010 complaint was in anyway related to Zukowski's e-mail to West regarding Gill's failure to follow department policy. *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007)("[T]he mere fact that one event preceded another does nothing to prove that the first event caused the second; the plaintiff also must put forth other evidence that reasonably suggests that her [race] was related to her employer's discrimination.")(citation omitted). Instead, the record establishes the reasons for each of Zukowski's complaints. The September 10, 2010, complaint focused around Gill's comments about Zukowksi's daughter. And, Zukowski's e-mail to West focused on

Gill's failure to follow department policy. To find that race was a motivating factor of either complaint would require speculation, which is insufficient to stave off summary judgment.

Next, Gill simply argues that, she has "constantly be[en] picked at, for no apparent reason," and that other employees have engaged in much more severe violations with less severe consequences. (Gill dep. p. 69). Such general statements are not enough to create a triable issue of fact; indeed, such bald allegations would likely not enough stave off a motion to dismiss. *See e.g. Riley v. Vilsack,* 665 F.Supp.2d 994, 1004 (W.D. Wis. 2009); *Grant v. Roth*, No. 93 C 7455, 1998 WL 13327, *8 (N.D. Ill. Jan. 7, 1998); *Thomas v. Illinois Dept. of Public Aid*, No. 96 C 7968 1997 WL 473917, *2 (N.D. Ill. Aug. 15, 1997). While the record does show that Gill had incidents with certain co-workers, the record also establishes that Soller properly handled each of those incidents.

Finally, Gill asserts that she was unfairly given a disciplinary write-up for reporting to work late without giving the Center enough advance notice. Gill stated that she gave the Center two hours of notice that she would be late, which was the required amount of notice required by the LaPorte Policies. However, LaPorte's Call-Off Policy requires at least four hours of advance notice, Ex. J(A), which Gill admittedly did not give. Thus, Gill being written up for not following policy can't be characterized as

discrimination. *Wolf v. Buss, Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)(The Court "does nto sit as a super-personnel department that re-examines an entity's business decisions. The question is not whether [defendant] has exercised prudent business judgment but whether [plaintiff] has come forward to refute the articulated reason for [her] discharge.").

> There is no evidence that similarly situated
> employees outside the protected class
> <u>received systematically better treatment.</u>

Gill argues that she was treated worse than Mary Pickens, a white employee, which is circumstantial evidence of racial discrimination. Trading shifts between employees at the 911 Center was an unwritten policy that allowed employees to accommodate their personal schedules and need for time off. Pursuant to this policy, Gill made an agreement to trade work days with another dispatcher, Tori Cazy, a white employee. However, when it was time for Cazy to work Gill's shift, Cazy advised her supervisors that she would not be at work. Gill was then called to come in for her scheduled shift, but she was unable to come in due to her child's health care appointment. As a result, both Gill and Cazy were charged a vacation day for their respective absences. Around the same time, dispatchers, Mary Pickens and Ang Brown, both white employees, traded days. Ang Brown failed to show for Pickens shift that she agreed to take and Ang Brown was charged a vacation day. However,

Pickens, unlike Gill, did not get charged a day off.  Gill points to the white employee, Mary Pickens, who was given more favorable treatment than she was, as direct evidence of racial animus.

It is true that Pickens was treated better than Gill. However, it is also true that Pickens was treated better than Brown and Cazy, both white employees.  Thus, of the three employees who did lose a vacation day for failing to show up for work, two were white and one was black.  This can hardly be seen as a single example of racial animus, much less showing that white employees are getting systematically better treatment than black employees. *Bates v. City of Chicago*, 726 F.3d 951, 955 (7th Cir. 2013)(*citing Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993)).

> There is no evidence that the plaintiff was qualified for the job in question but was passed over in favor of a person outside the protected class and that the employer's stated reason was a pretext for <u>discrimination.</u>

Gill complains about Zukowski's conduct surrounding the call that resulted in Gill's termination.  Gill argues that Zukowski knew about Gill's decision to cancel the call and Zukowski did not countermand her otherwise.  In addition, Gill claims that it is significant that Zukowksi did not include in her report that Gill had discussed this call with her prior to cancelling the call. While Gill takes issue with her relationship with Zukowski and

Zukowski's report, she has wholly failed to show that LaPorte County's stated reason for terminating her was pretextual. Indeed, after Gill was brought in to speak with Soller, West, Huston and Zukowski, regarding her failure to send an officer, Gill did not raise any issue with Zukowski's actions. (Gill dep. pp. 67-68). Moreover, Gill's punishment is not unusual. A white employee, Ang Brown, broke the same rule by cancelling a dispatch, and was similarly terminated. Zukowski's conduct was not a pretext for discrimination. Instead, Gill was terminated for not following LaPorte policy.

Whether the complained of acts are looked at individually or in the aggregate, Gill has failed to create a convincing mosaic of circumstantial evidence of intentional discrimination.


<u>Indirect Method</u>

When using the indirect method a plaintiff must first make a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To do this, the plaintiff must show that 1) he belongs to a protected class 2) he was meeting his employer's legitimate performance expectations 3) he suffered an adverse employment action and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).

If the plaintiff is able to make out a prima facie case the burden then shifts to the defendant to make a legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. 792 at 802. If the defendant meets this burden then the plaintiff is afforded a chance to show that the defendant's nondiscriminatory reason is mere pretext for discrimination. *Id.* at 804. To show pretext the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence." *Fane*, 480 F.3d 534 at 541. While the burden does shift between the plaintiff and the defendant, the ultimate burden of persuasion is always with the plaintiff. *Id.* at 538.

In starting to make out a prima facie case, there is no question that Gill is a member of a protected class. However, whether Gill was meeting her employer's legitimate performance expectations is another story. Gill admits that the 911 Center has a policy that all 9-1-1 calls put into the 9-1-1 Dispatch system get dispatched regardless. This policy is contained in a memorandum kept on a memo board within the 911 Center. Gill also concedes that she did not dispatch a call received on October 13, 2010. Nevertheless, Gill attempts to pass this threshold by placing a shared responsibility and blame on Zukowski. Generally, attempts to shift blame in this manner are not useful. *Schultz v.*

*General Elec. Capital Corp.*, 37 F.3d 329, 334 (7th Cir. 1994). Indeed, since Gill was responsible for knowing the policy and failed to comply with it, she can not be said to be meeting LaPorte's legitimate expectations. See *Cracco v. Vitran Exp., Inc.*, No. 07 C 0756, 2007 WL 3171325, *5 (N.D. Ill. October 24, 2007). Thus, Gill is unable to make out a prima facie case. This is not the only reason that Gill is unable to show discrimination under the indirect method. Gill is also unable to point to other similarly situated employees who were not members of the protected class were treated more favorably. Indeed, other white dispatchers were fired for failing to follow the same procedure. (Exs. 32, 33). Moreover, LaPorte has a legitimate, nondiscriminatory reason for the adverse action: that is, Gill violated LaPorte's dispatch policy. Lastly, although Gill takes issue with LaPorte's definition of "dereliction" and "neglect of duty," as well as Zukowksi's failure to correct Gill's cancelling the dispatch on October 13, 2010, Gill has not shown pretext.

CONCLUSION

For the reasons set forth below, motion to admit and motion for summary judgment are **GRANTED**. Because no claims remain pending, this case is **DISMISSED** and the Clerk is **ORDERED** to enter judgment in favor of Defendant and close this case.

**DATED:  February 7, 2014**                    /s/RUDY LOZANO, Judge

United States District Court